**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ECONOMICS LABORATORY, INC., Respondent.**

No. 88–3040.

United States Court of Appeals, Third Circuit.

Argued July 18, 1988.

Decided Sept. 27, 1988.

---

Barbara A. Atkin, Supervising Atty., Laurence S. Zakson, Atty. (argued), N.L. R.B., Washington, D.C., Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, for petitioner.

Stephen J. Cabot (argued), Myerson & Kuhn, Philadelphia, Pa., for respondent.

Before HIGGINBOTHAM, BECKER and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

Petitioner National Labor Relations Board (the Board) applies for enforcement of an order directing respondent Economics Laboratory, Inc. (Ecolab or the Company)[1] to bargain with the Highway and Local Motor Freight Drivers, Dockmen and Helpers, Local Union No. 701 a/w International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the Union) as Ecolab's exclusive employee representative.

Ecolab, a manufacturer of industrial detergents, consented to a decertification election to determine the representative status of the Union. Four of the ballots cast at the election were challenged, two by the Company and two by the decertification petitioner, each alleging that the challenged voters were ineligible because they were on Long Term Disability (LTD). The Acting Regional Director (RD) declared the challenged voters eligible, counted their votes, and certified the Union. Ecolab nonetheless refused to bargain with the Union, arguing that the Board's RD had arbitrarily and capriciously determined that LTD recipients were eligible to vote. The Board rejected Ecolab's objections, and held that Ecolab's refusal to bargain constituted an unfair labor practice. We deny the Board's petition for enforcement.[2]

### I.

Under the consent agreement, eligible voters included employees who were employed during a specified pay period as well as employees "who did not work during said payroll period because they were ill." Employees who resigned or were discharged for cause were excluded.

One hundred four individuals cast ballots at the January 1987 election. Ecolab challenged the votes of Marcello Cruz and Barbara Sturman, while the decertification petitioner, John Galya, challenged the votes of Christine Person and Victor Hunt.[3] A count of the remaining ballots revealed fifty votes for, and fifty votes against, the Union. Because the four challenged ballots affected the election results, the Acting Regional Director conducted an *ex parte* administrative investigation. Ecolab presented documentary evidence to support its contention that the individuals were no

---

**1.** In the course of this litigation, Economics Laboratory, Inc. has changed its name to Ecolab, Inc.

**2.** This court had jurisdiction over the Board's application for enforcement under 29 U.S.C. § 160(e), § 151.

**3.** The names of all LTD participants were included in a list of employees submitted by Ecolab. Ecolab admits that it erred in submitting a list that included LTD participants and in failing to challenge the votes of at least two other LTD participants. It asserts, however, that these errors arose from excusable neglect rather than from inconsistent policy.

longer employees. The RD considered Ecolab's submissions, refused to hold a hearing on the employment status of the challenged voters, and concluded that the votes should be counted because the employees had not resigned or been discharged. Each of the challenged votes favored the Union, and, as a result, the RD certified Local 701 as the bargaining unit's exclusive representative.

### A. The LTD Program and Indicia of Employee Status

The LTD program is funded by employee and employer contributions to a trust administered by an insurance company.[4] Employees are eligible for LTD after a six month waiting period during which they receive Short Term Disability (STD) benefits.[5] To be eligible for LTD benefits, an employee must be (1) totally disabled, (2) under the care of a doctor, and (3) unable to work for pay. LTD payments continue after twelve months only if the claimant is unable to become qualified for any subsequent job. As long as eligibility is maintained, benefits continue to age sixty-five or seventy, depending upon the employee's age at the time of the disability.

Ecolab's written description of the LTD program suggests that the participants are no longer employees. It states:

> If it is medically possible for you to go through retraining in a rehabilitation center to learn a new skill or return to your old job, EL wants to provide this opportunity and give you top priority in returning to work with EL. However, returning you to work with the company will depend on your successful rehabilitation and the availability of a job.

Ecolab asserts that it reemployed only one of twenty-three LTD recipients, and that the returning employee was treated as a new applicant. Two other individuals who completed LTD status sought, but were denied, reemployment.

The collective bargaining agreement (CBA) in force before the election required Ecolab to "post as a *permanent* bid the job of any employee who has been on disability for six (6) months and goes on Long Term Disability." (Emphasis added). Thus, this provision empowered the employer to permanently replace any employee who, after six months, went on LTD. The CBA also provided that individuals retained their accumulated seniority for up to three years of "no work," including three years of disability. LTD participants received credit for accumulated seniority only after returning to work. Because seniority was not a consideration in determining whether an LTD recipient would be rehired, a returning employee could not displace a less senior employee from his position.

Finally, Ecolab's policy and practice was to delete the names of LTD recipients from both its payroll and its "Status of Employees Report." Ecolab contends that individuals removed from the report are not considered employees for any purpose.

### B. The Challenged Voters

Ecolab submitted undisputed documentary evidence regarding the contested voters' medical conditions and disability status. The RD's investigator also interviewed the voters to determine whether, at the time of the election, they intended to return to work.

Marcello Cruz, a chemical compound operator, began receiving STD payments in February 1984, almost three years prior to the election. He additionally received LTD and Social Security Disability Income (SSDI) benefits effective August 1984. Undisputed medical evidence demonstrates that Cruz, who suffers from "severe bilateral venous insufficiency of [the] lower ex-

---

**4.** LTD participants are paid 60% of their monthly earnings, an amount which may be reduced by any sum paid or payable pursuant to other federal, state, or private disability programs. Thus, participants are warned that "[i]t is very important that you apply for Social Security benefits, since your LTD benefit will be reduced by the amount of any disability benefit for

which you are *eligible*—regardless of whether you actually receive the benefit."

**5.** The Short Term Disability program ceases "after six consecutive months of disability or upon the employee's qualifying for LTD, whichever occurs first."

tremities," "leg ulcers," and "essential hypertension," is totally disabled and will never recover sufficiently to return to work. Because Cruz was unavailable during the investigation, it is unknown whether he had an intention to attempt to return to work.

Victor Hunt, a fork lift operator, began receiving STD benefits in February 1986, and LTD benefits in August of that year. There is no evidence that he received SSDI benefits. Hunt suffers from liver dysfunction, bradycardia, bronchial asthma, viral syndrome, mitral valve prolapse, paroxysmal atrial fibrillation, and panic attacks. According to undisputed medical evidence, Hunt's ailments are non-curable and he is totally disabled. However, Hunt informed the Board investigator that at the time of the election, he still intended to return to work.

Christine Person, a custodian/scrubber, worked at Ecolab until April 1985 when she became eligible for SSDI payments. Person has been on LTD since October 1985. Uncontested medical evidence disclosed that Person has fatal lung cancer and is permanently disabled. During the investigation, Person nonetheless stated that she ultimately intended to return to work.

Barbara Sturman, a chemical compound operator, worked at Ecolab until February 1986, and has been on LTD since August 1986. She suffers from a compression of the cervical spinal cord. Undisputed medical evidence shows that Sturman's disability permanently disqualifies her from any occupation. At the time of the election, Sturman asserted that she also intended to return to work.

## II.

### A. Scope of Review

The Board charged that Ecolab's refusal to bargain with the certified Union constituted an unfair labor practice in violation of 29 U.S.C. § 158(a)(5) and (1). Ecolab asserts that its refusal was predicated upon the RD's inclusion of non-eligible vot-

6. The RD also considered and rejected other Ecolab objections to the election procedures. Ecolab has not pursued these objections and

ers in certifying the Union's status.[6] If Ecolab's contentions are correct, then the Board's order cannot be enforced; Ecolab is not obligated to bargain with a non-representative Union.

The Board conducted the disputed election pursuant to the terms of the consent agreement which provided that objections and challenges would be investigated by the RD, "whose decision shall be final and binding." We may reverse the RD's eligibility determination only if it is arbitrary, capricious, or violative of due process. *NLRB v. Staiman Brothers*, 466 F.2d 564, 566 (3d Cir.1972). That we might have reached a contrary result based upon the evidence presented is irrelevant; " 'something more than error is necessary to spell out arbitrary or capricious actions.' " *Id.* (quoting *Carlisle Paper Box Co. v. NLRB*, 398 F.2d 1, 6 (3d Cir.1968)).

### B. Ecolab's Claims

Generally, an employee must be employed on the election date and on the last day of the preceding payroll period to vote in an NLRB certification election. *NLRB v. Newly Weds Foods, Inc.*, 758 F.2d 4, 7 (1st Cir.1985). Employees who are laid off or placed on sick or maternity leave pose special problems. The Board has developed different standards to determine whether such persons still "retain their employment status and are therefore considered to have sufficient interest in the outcome of the election to be permitted to vote." *Newly Weds*, 758 F.2d at 8 (quoting *Whiting Corp.*, 99 N.L.R.B. 117, 123, *rev'd*, 200 F.2d 43 (7th Cir.1952)).

Here, the RD applied the *Red Arrow* standard to the contested voters, noting that:

[t]he Board has long recognized that an employee on sick or maternity leave is presumed to continue in employee status unless and until the presumption is rebutted by an affirmative showing that the employee has been discharged or has resigned.

they are therefore waived. *NLRB v. Browning–Ferris Industries, Inc.*, 691 F.2d 1117, 1125 (3d Cir.1982).

(citing *Red Arrow Freight Lines, Inc.*, 278 N.L.R.B. 965, 965 (1986)). The RD considered the submitted evidence and, without holding a hearing, concluded that Ecolab failed to rebut the presumption of continued employment status. After Ecolab's refusal to bargain, the Board granted summary judgment against it, holding that the RD's voter eligibility determinations were not arbitrary and capricious.

Ecolab renews its challenge to the Union's certification on four grounds. First, it vigorously contends that the *Red Arrow* test is a departure from long established precedent which determined only whether an employee had "a reasonable expectation of returning to work within a reasonable time." Ecolab asserts that the Board has arbitrarily and capriciously adopted the *Red Arrow* standard without "analysis, rationale, or meaningful explanation." Second, Ecolab contends that the RD arbitrarily and capriciously applied *Red Arrow* to employees on long-term disability, although LTD recipients ordinarily have serious and permanent medical disabilities readily distinguishable from the temporary illnesses suffered by employees on sick leave. Third, the Company contends that the RD acted arbitrarily, capriciously, and in violation of due process when it refused to accord Ecolab a hearing on the employee status question. Finally, it argues that the RD arbitrarily and capriciously concluded that the presumption of eligibility was not rebutted.

Ecolab's first three contentions have much to commend them. It is not clear that the *Red Arrow* test deserves judicial deference [7] or that the RD correctly applied the test to determine the status of LTD recipients.[8] However, we need not reach these issues [9] because we believe that our

7. Ecolab argues that the RD should have determined only whether the challenged employees have a "reasonable expectancy of reemployment within a reasonable time in the future." *See, e.g., Price's Pic–Pac Super Markets, Inc.*, 256 N.L.R.B. 742, 743 (1981) (reasonable expectation test applied to determine status of individual on sick leave), *enf'd*, 707 F.2d 236 (6th Cir.1983); *Whiting Corp. v. NLRB*, 200 F.2d 43, 45 (7th Cir.1952) (same). The Board contends that the reasonable expectation test is used to determine the status of laid-off employees but that the rebuttable presumption test has ordinarily been applied to determine the status of individuals on sick or maternity leave. *See Red Arrow*, 278 N.L.R.B. at 965; *Atlanta Dairies Cooperative, Inc.*, 283 N.L.R.B. No. 51 (Mar. 25, 1987). The Board asserts that the *Red Arrow* standard is not arbitrary and capricious because it merely reiterates and clarifies long-standing Board policies mandating differential treatment of employees who are laid off and those on sick or maternity leave. *See Medline Industries, Inc. v. NLRB*, 593 F.2d 788, 791 (7th Cir.1979) (collecting cases utilizing rebuttable presumption rule). The Board admits, however, that these tests of employee status have not been consistently applied, *Red Arrow*, 278 N.L.R.B. at 965 n. 5, and therefore we believe that they may not be accorded the traditional degree of judicial deference granted to agency determinations, *INS v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987). Further, where the voter's employee status is uncertain, the *Red Arrow* rebuttable presumption standard appears to directly conflict with prior precedent and the policies underlying federal labor law to the extent that it precludes consideration of the employees' reasonable expectation of future employment. *See, e.g., Red Arrow*, 278 N.L.R.B. at 965 n. 4; *Newly Weds*, 758 F.2d at 8; Annotation, *Voting Eligibility of Employees Absent Because of Illness, Injury, or Maternity Leave*, 85 A.L.R.Fed. 188 (1987). *Red Arrow* may also conflict with our decision in *Staiman Brothers*, 466 F.2d at 567, if, as the Board appears to contend, it precludes consideration of the disability status of contested voters.

8. The Board's adoption of a rebuttable presumption test for employees on sick or maternity leave is based upon two assumptions: "in those situations, a more definite time frame is established ... and there is a much greater chance that the employees will return to the same place of employment. Thus, there exists in those situations ... a reasonable expectation of return to work." *Sid Eland, Inc.*, 261 N.L.R.B. 11, 11 (1982) (contrasting injury or maternity leave with other leaves of absence). Where these assumptions are not true—as where an employee is permanently disabled—application of the rebuttable presumption test may be arbitrary and capricious because there simply is no "reasonable expectation of return to work."

9. Ecolab contends that its medical and documentary evidence was sufficient to raise a substantial and material question as to whether the challenged voters were in fact employees. Ecolab's undisputed submissions demonstrated that the contested voters were permanently disabled, that they would never be able to return to work, that they had been removed from the Company payroll and Employee Status Report, and that their employer no longer treated them as em-

resolution of Ecolab's fourth issue asserting that RD acted arbitrarily and capriciously in finding that the contested voters were eligible to vote, even under the *Red Arrow* test, is dispositive.

### C. The Employee Status of the Contested Voters

Under the rebuttable presumption test applied by the RD, the voter eligibility of individuals on sick leave may be challenged only by "an affirmative showing that the employee has been discharged or resigned." *Red Arrow*, 278 N.L.R.B. at 965. Here, the RD reviewed the evidence submitted [10] and concluded:

> In the instant case, neither the evidence proffered by the Employer nor that adduced by the investigation revealed that the challenged voters had been terminated or resigned from employment. While their physicians have not declared them well enough to return to work, with the exception of Cruz, who was unavailable during the investigation, the other three employees have all expressed an intent to return to work when able to do so. Further, they all receive monthly disability benefits from the Employer's disability insurance carrier and are covered by the Employer's health insurance benefit program. Accordingly, in the absence of evidence that they have been terminated or resigned, I conclude that Marcello Cruz, Victor Hunt, Barbara Sturman, and Christine Person were employed in the unit during the voter eligibility period and that their ballots should be opened and counted.

ployees. Ecolab asserts that it therefore met its burden of presenting a prima facie case of voter ineligibility and that the RD acted arbitrarily and capriciously in refusing to hold a hearing on the employee status question.

**10.** The RD summarized the evidence of employment status as follows:

> The Employer contends that once employees are on LTD they are no longer part of its regular employee complement. In this regard, they are not counted in the budget, their jobs are permanently bid out, they do not participate in bidding or bumping, they do not appear on the payroll, they do not receive vacation or holiday pay, nor are they affected

Ecolab contends that the RD made his determination arbitrarily and capriciously.

Although our scope of review is limited, *Staiman Brothers*, 466 F.2d at 566, the RD's determination cannot stand. Even under the arguably invalid *Red Arrow* standard, the RD arbitrarily and capriciously ignored past Board precedent and permitted an important union decertification vote to rest upon the votes of individuals who were no longer Ecolab employees.

A party seeking to preclude a vote at a Board-conducted election bears the burden of establishing ineligibility. *Bo-ed, Inc.*, 281 N.L.R.B. No. 35 (Aug. 29, 1986). Employment status generally continues until there has been "a manifestation of the intent to terminate which is clearly communicated to the other party." *Staiman Brothers*, 466 F.2d at 566. A comprehensive review of the Board's treatment of employees on sick and maternity leave reveals, however, that the Board has considered a variety of factors in determining whether contested voters remain eligible to vote in union elections. The Board has examined whether the employer's payroll or personnel records manifest termination; whether the contested voter has been permanently replaced; whether communications between the employer and employee suggest termination or resignation; whether the contested voter has retained his or her seniority; and whether the contested voter's medical status will permit a return to work. *See Voter Eligibility*, 85 A.L.R. Fed. 188 (1987). The Board's past practices disclose that no single factor is controlling.

> by wage increases or decreases negotiated with the Union.... The Employer proffered the opinion of Gary Goldstein, M.D., whose opinion, after viewing medical records and consulting with the employees' personal physicians, was that these employees were permanently disabled and could not reasonably be expected to return to work.
>
> It is undisputed that employees on LTD retain their seniority for three years.... They receive life insurance and dental coverage provided by the Employer and they retain their I.D. cards and uniforms, which terminated employees are required to return. Further, as of the date of the election, these employees had neither been terminated by the Employer nor had they resigned.

In no case, however, has the Board found that a person retained employment status on facts similar to those presented here.

Ecolab presented abundant evidence of termination, including the removal of LTD participants from the payroll and Employee Status Report,[11] and their replacement, according to the terms of the CBA, with permanent employees.[12] Further, Ecolab's LTD program plainly communicated an intention to terminate LTD recipients by stating that, although they would be accorded "top priority," their return "to work with the company will depend on [their] successful rehabilitation and the availability of a job."

In the face of this overwhelming evidence of employment termination, the RD cryptically concluded that the evidence did not reveal "that the challenged voters had been terminated or [had] resigned from employment." In so holding, the RD seems to have transformed *Red Arrow's* rebuttable presumption of continued employment into an irrebuttable presumption that employees on disability leave remain employees absent specific termination let-

ters.[13] The Board admits, however, that under some circumstances, constructive terminations might be sufficient to rebut the *Red Arrow* presumption, but the RD apparently failed to consider that possibility here.

The RD relied on a number of additional factors in finding that LTD recipients remained employees. At best, these factors provide equivocal or insignificant evidence of a continued employment relationship. For example, the RD noted that LTD recipients continued to receive health benefits from both the employer's insurance carrier and from the employer itself.[14] Although these facts, including the absence of a specific discharge letter, are consistent with Ecolab's adoption of a humane disability program, they are not necessarily indicative of continued employment status. Retirees, for example, who are no longer employees eligible to vote, often retain similar benefits.

The RD noted that LTD recipients retained seniority rights for three years, but he failed to recognize that these rights were limited. Employees could not assert

---

**11.** It is undisputed that Ecolab's Employee Status Report is the document issued by it for all personnel actions. Layoffs, recalls, and job bidding are determined by the information in this report. A person whose name does not appear on this report is not deemed an employee. *Compare Sterling Cotton Mills, Inc.*, 74 N.L.R.B. 1274, 1276 (1947) (employment status ceases when name removed from payroll); *Cone Mills Corp.*, 107 N.L.R.B. 866, 869–70 (1954) (where employer's personnel records indicate termination, employee declared ineligible); *Hercules, Inc.*, 225 N.L.R.B. 241, 241–42 (1976) (employee ineligible where internal company documents indicate termination); *Harry Lunstead Designs, Inc.*, 270 N.L.R.B. 1163, 1164 (1984) (ineligible where employee removed from payroll pursuant to company procedure); *with Newly Weds,* 758 F.2d at 7, 9 (eligible where employee remains on payroll); *National Medical Hospital, Inc.*, 210 N.L.R.B. 894, 894 (1974) (eligible where employee's name not removed from payroll), *enf'd*, 528 F.2d 938 (9th Cir.1975); *Sexton Welding Co.*, 96 N.L.R.B. 454, 455 (1951) (eligible where employer's payroll contained penciled notation manifesting intent not to rehire where employer had misled employee as to status); *Gastonia Combed Yarn Corp.*, 73 N.L.R.B. 169, 174 (1947) (eligible where employer did not have a policy of removing names from payroll).

**12.** The Board has previously considered the effect of replacement of injured or sick employees. *See, e.g., Whiting Corp. v. NLRB*, 200 F.2d at 45 (ineligible where permanently replaced); *Tampa Sand & Material Co.*, 137 N.L.R.B. 1549, 1550 (1962) (same). *Compare Armour & Co. of Delaware*, 36 N.L.R.B. 306, 310 (1941) (eligible where not replaced); *Keeshin Charter Service, Inc.*, 210 N.L.R.B. 780, 792–93 (1980) (eligible where employee not told of replacement).

**13.** Under the Board's interpretation, a paraplegic on LTD status for ten years·who never resigned and to whom the employer did not send a notice of discharge would remain eligible to vote and could determine the status of the employees' labor relations, even if the paraplegic is no longer physically capable of performing any job task available with the employer.

**14.** The Board notes that LTD recipients appeared on the list submitted by the employer and that some of these individuals voted without challenge. However, Ecolab contended before the RD that the list was a list of union members, not of employees, and that names were not removed from the list until Ecolab received notification that the individual was not a union member. The votes of other LTD recipients are therefore not determinative of the status of the contested voters.

seniority rights to obtain employment reinstatement should they terminate LTD. Only if a job became available with the company and the employee were rehired would seniority rights regain their vitality. At that point, seniority rights were restored retroactively. The RD also relied upon LTD participants' retention of the ID cards and uniforms which terminated employees were asked to return. No significance may be ascribed to retention of ID cards and uniforms by employees absenting themselves for LTD because the employer had no way of knowing on their last work day that they would thereafter never return to work. Although considered by the Board, these factors are not determinative.[15]

Finally, the RD refused to consider the relevance of Cruz's and Person's receipt of SSDI benefits, holding that evidence of their permanent disability was irrelevant under the rebuttable presumption test. This refusal was arbitrary and capricious, even assuming that the Board's rejection of the "reasonable expectation" test in *Red Arrow* was proper. *See supra* note 7. Cruz's and Person's SSDI benefit applications are indeed objective evidence of their inability to return to work and therefore relevant; in applying for benefits, an applicant has the burden of proving an inability to engage in any substantial gainful activity for at least twelve months. *See* 42 U.S.C. § 423(d)(1), (d)(2)(A) (1982 & Supp. III 1985); *Staiman Brothers*, 466 F.2d at 566–67 n. 3; *NLRB v. Connecticut Foundry Co.*, 688 F.2d 871, 878 (2d Cir.1982) (receipt of disability benefits is relevant factor in determining eligibility).

The RD appeared to rely upon the Board's decisions in *Red Arrow*, 278 N.L.R.B. 965, and in *Atlanta Dairies Cooperative, Inc.*, 283 N.L.R.B. No. 51. In *Red Arrow*, the Board found that an employee on sick leave remained eligible to vote where she remained on the payroll and continued to receive benefits such as holiday pay and vacation accrual, and where her position remained open. 278 N.L.R.B.

at 965. In *Atlanta Dairies*, 273 N.L.R.B. No. 51, the employer's own credit manager testified that the employer's policy mandated that disabled employees be carried on the company's employment rolls until retirement. Both cases are thus wholly distinguishable on their facts.

We therefore hold that the RD arbitrarily and capriciously determined that the contested voters remained Ecolab employees eligible to vote in the decertification election. Because the RD's determination had no basis in either fact or law, it constituted reversible error.

### III.

In summary, we deny the Board's petition for enforcement of its order against Ecolab because the RD arbitrarily and capriciously concluded that the employer had not rebutted the presumption of eligibility.

Costs taxed against the Board.

A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting.

Gertrude Stein once remarked, "a rose is a rose is a rose." However, the definition of an employee under the National Labor Relations Act is more difficult than that of a literary conceit: one must determine the status of employees across the many forms of their work and natural lives. The statute merely tells us that *"[e]mployees* shall have the right to self-organization ..." and that "[i]t shall be an unfair labor practice for an employer ... to refuse to bargain collectively with the representatives of his *employees* ...". National Labor Relations Act of 1935, as amended, §§ 7, 8(a)(5) (29 U.S.C. §§ 157, 158(a)(5)(1)). The Board, drawing on its extensive experience with union elections, has decided that the exigencies of defining this broad concept in this context are best served by a bright line rule, enunciated in *Red Arrow*. In my view, this rule is a valid exercise of the Board's discretion to make rules in the area of its special expertise.

---

**15.** The RD also relied upon the expressed intention of the voters to return to work. While this evidence may be relevant to determine whether

the employees had resigned from employment, it does not determine whether they had been terminated.

The majority questions the validity of *Red Arrow* and holds that in any event the Board misapplied the *Red Arrow* standard in holding that employees on long term disability leave remain part of the bargaining unit for the purpose of voting in a decertification election. As I see it, this situation falls squarely within the holding of *Red Arrow*. I therefore respectfully dissent.

The majority concedes that the Board has considered a variety of factors in determining whether contested voters remain eligible to vote in union elections. Maj. at 937. Although the Regional Director ("RD") relied on five factors in reaching his decision, the majority insists that the following three different factors are better indicia of employment status: the removal of the name of a contested voter from the company's "Employment Status Report," his or her replacement with a permanent employee, and the Company's ambiguous statement in its LTD policy that employees on LTD leave would have "top priority" in filling new positions, but that their return to work would depend on their rehabilitation and the availability of jobs. Maj. at 937.

The first of these factors relies on the subjective analysis rejected in *N.L.R.B. v. Staiman Brothers*, 466 F.2d 564, 566 n. 2 (3rd Cir.1972), by allowing employers to dictate, based on internal classifying procedures, whether an employee has continued employee status, with its attendant rights and privileges. The second and third factors overemphasize two among several valid indicia of termination or continued employment by treating them as entirely dispositive on the question of employee status.

As this case illustrates, however, focusing on other factors, as did the RD in his application of *Red Arrow*, 278 N.L.R.B. 965 (1986) is not arbitrary and capricious. Indeed, in some cases, these factors will yield more reliable, objective indicia of employment than those favored by the majority.

Before going further, I should respond to the questions the majority raises in dicta about the continued validity of the *Red Arrow* standard. *See* maj. at 936. *See also id.* at 935 n. 7. I believe that the *Red Arrow* standard is a valid exercise of the Board's discretion to make rules in the area of its special expertise, and that the majority's doubts about *Red Arrow*'s validity are based on a misinterpretation of Supreme Court precedent.

The majority correctly observes that where an administrative agency has acted inconsistently, its rulings will not receive the degree of judicial deference traditionally granted to agency determinations. Maj. at 935 n. 7. What the majority fails to note is *how* inconsistent an agency must be before this lessened deference comes into play. The majority relies for evidence of the Board's inconsistency on its admission in *Red Arrow* that "in some isolated cases the Board may have used such language [of reasonable expectation of reemployment] in cases involving employees on sick or maternity leave...." *Red Arrow*, 278 N.L.R.B. at 965 n. 5. Judge Breyer in *NLRB v. Newly Wed Foods*, 758 F.2d 4 (1st Cir.1985), has also noted that the Board has used both the rebuttable presumption of continued employment adopted by *Red Arrow* as the Board's sole standard, and the reasonable expectation of continued employment in its recent cases. *See id.* at 8. But this type of inconsistency, remedied by the Board itself *before* this litigation, does not present the degree of striking inconsistency present in the cases where the Supreme Court evaluated an agency's expert judgment with lessened deference.

The majority cites *INS v. Cardoza-Fonesca*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), for the proposition that inconsistent agency interpretations are not due the normal amount of deference. Maj. at 935 n. 7. The majority does not mention that the case dealt both with an agency interpretation of a statutory term "strikingly contrary to [the] plain language and legislative history [of the statute]," 107 S.Ct. at 1223 (Blackmun, J., concurring), *see also id.* at 1217 (noting that the standard for a well founded fear of persecution "as it has been consistently understood by those who drafted it, as well as those draft-

ing the documents adopting it" differs from the INS's interpretation), and with an agency interpretation inconsistent with *both* its past and its current interpretations of the statute. The NLRB's *Red Arrow* standard neither exhibits an agency's willful indifference to the language of Congress, nor is it merely the penultimate offering in a string of inconsistent agency rulings.

*Watt v. Alaska*, 451 U.S. 259, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981), the Supreme Court's other significant case addressing the effect of an agency's inconsistent interpretations of a statute, involves the question of whether the addition of the word "minerals" to the list of revenue-producing wildlife refuge resources in a 1964 amendment to § 401(c) of the Wildlife Refuge Revenue Sharing Act, 49 Stat. 383, as amended, 16 U.S.C. § 715s (1982), directed the Department of the Interior to alter the distribution formula for revenues produced from such minerals from that laid down in the Mineral Leasing Act of 1920, 30 U.S.C. § 181 *et seq.* (1982), which had previously governed their distribution—for those on reserved wildlife refuge lands. The case turns in large part on a distinction between "acquired" wildlife refuge lands, that is those granted or sold to the federal government by a State or private citizen, and "reserved" ones, that is lands set aside out of those already within the public domain. Reserved lands had been handled under one formula and acquired lands under another. *Watt v. Alaska*, 451 U.S. at 270, 101 S.Ct. at 1680. The agency suddenly decided that the amendments mandated applying a single formula to both. As the Supreme Court pointed out, "the Department of the Interior interpreted the amendment when passed, and for 10 years thereafter, as not altering the distribution formula [for reserved lands]." *Id.* at 272, 101 S.Ct. at 1680. The Department's later interpretation deserved less deference due to its inconsistency with this well established prior position. *See also General Electric Co. v. Gilbert*, 429 U.S. 125, 143, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976) (inconsistency with prior agency rulings and interpretations is one factor among several determin-

ing how persuasive an EEOC ruling is).

By contrast, in our case, the Board had deviated in the past in some instances from an overall position consistent with the one adopted by *Red Arrow*. It had itself corrected its inconsistency by announcing in *Red Arrow*, prior to this case, that it would rely in the future on a single standard. No subsequent cases returned to the prior standard. The Board's application of *Red Arrow* is thus not an example of the striking degree of inconsistency that has led the Court to accord an agency's determination lessened deference. Moreover, the change of administrations often brings with it changes in agency practice. Any doctrine that too easily reduces deference to agency decisions based on announced changes in agency policy may weigh our review too heavily in favor of the status quo. For the ballot box to have full effect in our democratic but administrative state, we must preserve some flexibility for reasonable administrative change.

Under *Red Arrow*, the Board presumes that employees on sick, maternity, or disability leave have not permanently severed their employment relationship and that they therefore continue to maintain an interest in the outcome of elections. Accordingly, under *Red Arrow*, the Board requires an affirmative showing that the employment relation has been severed by the employer or the employee and that this severance has been conveyed to the other party. *See Red Arrow Freight*, 278 N.L.R.B. at 965; *Staiman Brothers*, 466 F.2d at 566.

Contrary to the majority's view, maj. at 935 n. 7, the *Red Arrow* test does not conflict with our decision in *Staiman*. *Staiman* held that it was an abuse of discretion for a regional director not to hold an hearing considering the alleged application for Social Security disability payments as evidence of the loss of employee status. *Staiman*, 466 F.2d at 567. *N.L.R.B. v. Connecticut Foundry Co.*, 688 F.2d 871 (2d Cir.1982) also cited by the majority, maj. at 938, dealt with the actual receipt of Social Security payments. The outcome

of this case would be the same were we to hold—a holding far beyond that of *Staiman*—that, as a matter of law, the votes of Cruz and Persons, the two employees who are receiving Social Security disability benefits, should not have been opened and counted. Ecolab has not even alleged that either of the other two LTD employees applied for Social Security disability payments, though Hunt informed his insurance company that he had applied for some form of Social Security benefits, Joint Appendix at 83 ("Jt. App."). Even if the majority discounted his vote, the union would still clearly win by one vote, Sturman's, even assuming that receipt or application of Social Security were determinative, rather than, as in *Staiman,* merely material evidence. *Staiman*'s concern for the materiality of Social Security disability payments is therefore not decisive here. By misstating the holding of *Staiman* as the importance of "disability status," and by suggesting that it may conflict with *Red Arrow,* the majority has gratuitously broadened the holding of *Staiman* from the materiality of Social Security disability benefits to the materiality of any form of disability.

In the context of elections, the burden of making the *Red Arrow* affirmative showing of termination or resignation, and thus ineligibility to vote, rests on the party challenging the vote in question. *Boed, Inc.,* 281 N.L.R.B. ——, at slip op. at 12 n. 24 (1986). The Company has not met its burden here. The fact that Ecolab has removed long term disabled employees from its employee rolls, which the majority views as dispositive, merely reflects the employer's subjective view of the employee's ability to return to active employment. *See* maj. at 938 (citing *Atlanta Dairies,* 283 N.L.R.B. —— (1987) as "wholly distinguishable" because the employer retained disabled employees' names on its rolls until their retirement). In my view, the majority's emphasis on this factor ignores *Staiman Brothers*'s direction that status for voting purposes should not rely too greatly on subjective characterizations such as an employee's intent to return to work. *See* 466 F.2d at 566 n. 2. The employer's ex-

pectation that the employee will not return to work, which is all that the removal of the employee from its employment rolls reflects, should be irrelevant—especially where, as here, the contrary intention had been indicated to the employee in a written statement of company LTD policy. *See* Jt. App. at 248 (company directive entitled "Leaves of Absence" stating "one of the most important parts of the LTD program is to help you return to work.... if it is medically possible for you to go through retraining ... to learn a new skill or *return to your old job,* [Ecolab] wants to provide this opportunity and to give you top priority in returning to work with [Ecolab]") (emphasis added). Inconsistent treatment of management's and the employee's expectations by this Court is particularly inappropriate in the adversary context of a union election.

The dangers of relying on management's subjective expectations are illustrated by this case. The Company has not been consistent in its opposition to the voting of employees on LTD leave. The Company did not challenge the voting of two other employees on LTD leave, M. Curry and W. Christmas. The Company also listed other employees on LTD leave on the list of potential voters provided to the Union. These employees did not vote in the election. The Company has attempted to explain away these inconsistencies by asserting that they arose through inadvertence. Reliance on internal company classification procedures encourages companies to claim that voters who vote against them in closely contested elections are terminated, whether or not management's genuine subjective expectation is that some employees on LTD will ultimately return to employment with the company.

The most persuasive point raised by the majority, that permanent employees replaced the LTD workers in their specific jobs, is insufficient to resolve the ambiguous position of LTD recipients. LTD recipients do share certain qualities with retirees or terminated workers: they no longer appear to work, and they cannot use their seniority by "bumping" or bidding for

new jobs. But in reality they have more in common with their shop floor colleagues. LTD recipients continue to receive health and dental insurance paid for by Ecolab, and to draw a monthly wage. LTD recipients neither resigned nor received a letter of termination. As noted above, they are encouraged by the written LTD policy to seek rehabilitation and reapply for work. While the specific jobs that they held are "bid out," the written description of the LTD program also tells recipients that they will have "top priority" in returning work. Jt.App. at 248. Moreover, unlike terminated or retired employees, LTD recipients retain their identification cards and uniforms.[1] Similarly, should Ecolab rehire LTD recipients within three years of their last day of work, they would receive their seniority rights back unimpaired, hardly the position of a terminated employee. Although the majority states that "[i]n no case ... has the Board found that a person retained employment status on facts similar to those presented here," maj. at 937, the majority neglects to mention that in no case has the Board been presented with a case presenting facts closely analogous to these.

These indicia of employment are particularly important if one looks beyond the narrow circumstances of this case. Absent individualized determinations, LTD recipients will usually include at least a few individuals who may be capable of returning to work after further medical treatment or rehabilitation. Indeed, Ecolab itself had admitted that one employee who had been on long term disability leave had returned to work and that two others sought to return. Maj. at 933. L. Goines, who returned after three years of LTD leave, had been on leave considerably longer than all but one of the contested voters

had been at the time of the election. Since his original job as a shipping clerk had been filed, Goines assumed new responsibilities as a fork truck operator. Jt.app. at 127–28. To my mind, this evidence of the versatility of a returning worker and his or her ability and desire to reassume work responsibilities after an extended illness underscores the difficulty that exists in the review of these cases, and the error of the majority's view. The record contains no evidence that Eugene Haberman and Ed Klemas, the two LTD employees who sought to return to work in 1979, were not simply denied reemployment because no positions were available. *Id.* at 175 (letter from counsel for Ecolab noting only that two employees had been "denied reemployment when they attempted to return to work from long term disability status"). At other companies with different patterns of occupational illness and injury, significant proportions of the LTD population may be potential returnees. The *Red Arrow* rebuttable presumption of continued employee status protects these individuals from premature disenfranchisement.

There is no way to be certain whether a disabled employee will return to active work status. The majority prefers a presumption that the ill do not recover and that the disabled remain that way forever. That assumption is inconsistent with the realities of life, even as we experience them as judges. Thousands of cases have arisen in our federal court in the past few years because the Social Security Administration believed that the ill or the disabled who had received disability awards had recovered and should no longer receive benefits. In some of these cases, we agreed with the Administration. Like the rest of humanity, the employees of Ecolab will sometimes

1. The majority states that disabled employees retain their uniforms and I.D.'s because Ecolab has no way of knowing at the time the employee first goes on disability leave that he or she will not return to work. However, it is the essence of the majority's argument that LTD is a form of termination. *See* maj. at 938 n. 15 (holding that the RD's reliance on the employees' expressed intention of returning to their jobs as misplaced, since "[w]hile this evidence may be relevant to determine whether the employees had resigned

from employment, it does not determine whether they had been terminated"). If so, Ecolab could require employees, perhaps as a condition of continued receipt of LTD payments, to return their uniforms and I.D. cards, much as Ecolab required that LTD recipients apply for all governmental disability programs to whose payments they may be entitled, or suffer pro rata reduction of their LTD payments by the amounts by which they might otherwise have received.

recover from serious illnesses or disabilities. The policies that we encourage regarding their status should not be infused with the presumption that they will not. Companies that wish to resolve the position of their long term disabled employees, so as to protect themselves in a potential union election, may always do so by clearly conveying to those employees what Ecolab asserts is their de facto status: terminated.

Given the ambiguities noted above, the RD's decision that the LTD recipients retained employment status did not, despite the majority's assertion, transform the *Red Arrow* standard into an irrebuttable presumption. The RD's decision merely resolved an ambiguous situation in one principled way and so constituted a reasonable exercise of discretion. The parties agreed, in their original consent election agreement, that the RD's determination would be final. Jt. app. at 43 ("Agreement for Consent Election"). We should therefore respect the parties' wishes and only set aside a RD's determination when it is arbitrary and capricious. The burden of proof was on Ecolab to demonstrate the RD's capriciousness. Ecolab has not met this burden, but merely put forward evidence showing that the RD could reasonably have decided the other way. The majority has accepted this limited evidence and overruled the Board. In my view, this Court is not equipped to second guess the Board in its difficult choices of labor policy. Accordingly, I would hold that the Board's order to Ecolab to bargain with the Union should be enforced, and, therefore, I respectfully dissent.