Henry J. HELMER, Patrick Bencivengo, James Crow, William Dodd, John Duffy, James Kelly, Jack Lopez, James Mottett, Charles Piscopo, Manuel Sanchez, Philip Varrichio and John Walsh, Jr., Plaintiffs,

v.

Eugene BRIODY, Joseph Zummo, Jack Murphy, Michael Cotter, Richard Bestoff, each in his individual capacity only; Antonio Sanchez, in his official capacity as Secretary–Treasurer of Local 102, UWAU, AFL–CIO and in his individual capacity; Joseph Fino; and LOCAL 1–2, Utility Workers Union of America, AFL–CIO, and Consolidated Edison Company of New York, Inc., Defendants.

No. 89 Civ. 0467 (RWS).

United States District Court, S.D. New York.

Sept. 26, 1990.

---

Kevin G. Jenkins by Irwin Geller, of counsel, New York City, for plaintiffs.

Donald F. Menagh, P.C. by Vito Mundo, of counsel, Lewis, Greenwald, Kennedy, Lewis, Clifton & Schwartzs, P.C. by Arthur Z. Schwartz, of counsel, New York City, for defendants, except Con Edison.

Mary Schuette by Kenneth G. Standard, Saddie L. Smith, of counsel, New York City, for defendant Consolidated Edison Co.

## OPINION

SWEET, District Judge.

Defendant Consolidated Edison Company of New York, Inc. ("Con Ed") has moved for summary judgment in accordance with Rule 56, Fed.R.Civ.P., to dismiss the action

against it brought by plaintiff Henry J. Helmer ("Helmer") to obtain reinstatement by Con Ed. The motion was heard and submitted on July 6, 1990 and in accordance with facts and conclusions set forth below is granted.

This motion is perhaps almost the last skirmish, albeit a vital one, in the battle Helmer has waged since the fall of 1989 to recover his position with his union, the Utility Workers Union of America, Local 1–2, AFL–CIO (the "Local"), to participate in union elections, and to be restored to his former employment with Con Ed. In terms of the individual, the result reached here is harsh and the institutional requirements unyielding. The equities as between employer and employee would dictate that Con Ed should return Helmer to the post of Senior Coordinator which he held in July 1971 when he went on leave as an officer of the Local. However, the events of the ensuing 19 years altered Helmer's rights, an alteration which he failed to foresee when he "cashed out" in 1979. That failure, the Internal Revenue Code, and the language of the Consolidated Edison Pension and Benefits Plan (the "Plan") have combined to produce a result which has deprived Helmer of employment in the field and with the employer with which he is familiar.

## Prior Proceedings

The opinion of August 18, 1989 set forth the proceedings to that date, and that opinion with its findings and conclusions and definitional terms are incorporated here.

Since August 1989, in ways not material to this resolution, Helmer pursued his efforts to participate in the affairs of the Local and to obtain employment with Con Ed. A pretrial conference was held to that end on December 6, 1989, and various orders were entered with respect to discovery and motion schedules. By order of July 23, 1990 and stipulations so ordered on August 10, 1990, the pending issues were narrowed to the motion by Con Ed to dismiss Helmer's claim for reinstatement. Certain other claims and counterclaims between Helmer and the Local relating to their relationship remain outstanding.

## The Facts

The submission on this motion requires no modification of the facts previously found and set forth in the opinion of August 18, 1989, except as set forth below. No factual dispute has been presented with respect to those facts or those set forth below.

Helmer was first employed by Con Ed on August 8, 1955. On April 15, 1960 he resigned and on March 6, 1961 was reemployed as an Outside Plant Helper. He continued to work for Con Ed until September 30, 1961, when he took a military leave of absence from the company.

Helmer was reemployed in October 1963 and continued in the active employ of Con Ed until July 1971, when he became an officer of the Local and took a three month leave of absence, which was later extended. He held the clerical title of Senior Coordinator when he went on leave of absence. His leave continued undisturbed and unchallenged until his discharge as Business Manager of the Local in November of 1988.

In 1974 Congress enacted the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq. ("ERISA"). In accordance with this new law and the Internal Revenue Code, Con Ed developed a new pension plan. The Plan provided that an employee's entitlement to a pension, upon attainment of the requisite age and years of service, became vested after ten years of active employment. In addition, an employee not yet eligible to receive a pension was entitled to withdraw ("cash-out") the cash value of that vested pension benefit upon the termination of his or her employment relationship with Con Ed, including the portion contributed by the employer. A summary description of the Plan was mailed to all employees, to the Local, and to the attention of James Joy, the Business Manager of the Local.

To claim a cash-out under the Plan, an employee had to complete and sign the "Con Edison Pension and Benefit Plan, Interim Form, Benefits Statement for Terminating Vested Employee" ("Benefits Statement for Terminating Vested Employees")

(applicable when years of age plus years of service equal less than 75 at termination). Employees who were terminating their employment relationship with Con Ed and who were vested in the pension system were required to sign this document to cash out their pension benefits.

In 1979 Helmer sought and received a cash-out of his pension benefits amounting to $5860.40. He was counselled concerning his pension and other rights and he signed the Benefits Statement for Terminating Vested Employees.

After Helmer's removal from his office as Business Manager of the Local in 1988, he sought reinstatement to the Senior Coordinator job he had last held in 1971 or to a similar job, pursuant to Article VIII, Paragraph 32 ("Paragraph 32") of the 1986–89 collective bargaining agreement between Con Ed and the Local (the "Contract"), which provides for leaves of absence for employees who are union officers. Senior Coordinator is one of the top clerical jobs under the Contract. Con Ed concluded that Helmer had terminated his leave of absence by virtue of his cash-out and was not covered by Paragraph 32. The responsible Con Ed officers did not consult with any officer of the Local concerning Helmer's request.

Helmer requested the Local to file a grievance against Con Ed for its refusal to reinstate him. After an investigation of its own, the Local determined that Paragraph 32 did not cover Helmer.

Helmer then filed charges against both Con Ed and the Local with the National Labor Relations Board ("NLRB"), alleging, as he has here, that the Local breached its duty owed to him by failing to process his grievance to arbitration and that Con Ed breached the Contract by refusing to reinstate him under Paragraph 32. The NLRB dismissed both charges. The dismissals were affirmed on appeal to the NLRB's General Counsel.

On May 1, 1989, Helmer resumed employment with Con Ed at an entry level post only to be terminated on medical grounds. Con Ed affords leaves of absence of no more than a year to employees for pregnancy, child care, education, and personal reasons. While employees are on such leaves of absence, they are considered inactive employees and can normally expect to be reinstated to their former positions, or substantially similar positions, upon return to work. If employees resign or are terminated during leaves, however, the leaves are terminated and expectations of reinstatement end. Thereafter, if employees wish to return to work, they would normally be treated as applicants for reemployment. Con Ed's Industrial Relations Department is generally aware of which union officers are on leave pursuant to Paragraph 32.

*The Issue*

Four questions are presented for resolution by the pending motion:

1. Is summary judgment appropriate?

2. Did the Local wrongfully fail to grieve on Helmer's behalf?

3. Did the cash-out terminate Helmer's employment?

4. Does termination extinguish the right to reinstatement under Paragraph 32?

The affirmative answers to these questions demonstrates that when institutional forces act, individual rights can be extinguished, regardless of equitable considerations.

*The Standards for Summary Judgment*

To grant summary judgment, the court must determine that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The court's responsibility is not to resolve disputed issues of fact, *Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 57 (2d Cir.1987), but to determine whether there are any factual issues to be tried, while resolving ambiguities and drawing inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970)).

Nonetheless, summary judgment should be granted where no reasonable trier of fact could find in favor of the non-moving party. *H.L. Hayden Co. of New York v. Siemens Medical Systems, Inc.*, 879 F.2d 1005, 1011 (2d Cir.1989), and to enable the court to dispose of meritless claims before becoming entrenched in a costly trial. *Donahue*, 834 F.2d at 58 (citing *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)).

*The Local's Denial of Helmer's Request to Initiate a Grievance Was Improper*

Paragraph 32 of the Contract by its terms calls for Helmer's reinstatement. What is at issue is whether or not the leave of absence granted to Helmer was revoked or altered by the events of 1979, his cash-out. From the discussion that follows, and the ink that has flowed on the subject, the issue is difficult and calls into play conflicting concerns, the requirements of the Internal Revenue Code and the Contract between the Local and Con Ed.

There is no question but that at the time that Helmer made his request of the Local to pursue his grievance, success in that proceeding would have produced a result contrary to the position taken by the leadership of the Local at that time, namely, that Helmer was no longer a member of the Local and, therefore, was barred from participating in its affairs as he was then seeking to do.

It is also apparent that it was in the interest of the officers of the Local to establish the proposition advanced by Helmer, that cashing-out did not affect reinstatement rights and that reemployment under the Plan should be construed as reinstatement. For the reasons set forth below, these positions, though entirely arguable, are not sound as a matter of law. However, there can be no question but that their adoption would have been in the best interests of the officers of the Local, as a general proposition, Helmer's particular election status as a candidate for union office aside.

■ Section 301 of the Labor Management Relations Act creates subject matter jurisdiction over suits for violation of contracts between an employer and a labor organization. Normally, individual employees in the unit may not bring actions under § 301. Their exclusive remedy for alleged breaches of the collective bargaining agreement is through the grievance and arbitration procedures. Only if a union breaches its duty of fair representation by wrongfully refusing to proceed with the grievance, can an employee sue both the union and the employer under § 301. *See generally Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

■ When Helmer sought reinstatement in November 1988, his employment status was at issue, and he sought a determination of that status and enforcement of his rights as a member of a collective bargaining unit of employees. *See McTighe v. Mechanics Educational Society of America, Local 19*, 772 F.2d 210 (6th Cir.1985); *Karo v. San Diego Symphony Orchestra Association*, 762 F.2d 819 (9th Cir.1985); *Toth v. USX Corp.*, 693 F.Supp. 693 (N.D. Ill.1988), *aff'd*, 883 F.2d 1297 (7th Cir.), *cert. denied*, ─── U.S. ───, 110 S.Ct. 544, 107 L.Ed.2d 541 (1989).

Under these circumstances, the Local improperly denied Helmer an opportunity to file a grievance to resolve the very issue raised by the cash-out which, if resolved in his favor, would permit him to continue his challenge to the acts of the Local's officers. While the ultimate resolution is not in his favor, Helmer had a right to a grievance and having been denied that right, has jurisdiction under § 301 to state a claim against Con Ed.

*Cashing-Out Terminated Employment*

■ In 1979 when Helmer elected to receive the cash-out, he completed and signed the Con Ed form headed "Consolidated Edison Pension and Benefits Plan, Interim Form, Benefits Statement For *Terminating* Vested Employee" (emphasis added). The form contained the following terms:

If a "cash out" is elected, and you are later reemployed, all rights to your accrued vested pension based on the accredited years of service included in de-

termining your deferred pension cited above will be satisfied and suspended until such time as you repay the full amount of such "cash out" with interest at 5½% per annum compounded annually from date of cash out to date of payment.

On the form, Helmer signed in the space indicating that his rights had been fully explained to him and that he was electing to take a cash-out. At the bottom of the form there is another reference to the "terminating employee" to whom its contents are directed. Helmer was given a termination interview, his cash-out request received the necessary approvals, and his name appeared on Con Ed's official listing of "retiring" employees.

The Plan provided in relevant part:

E. *Termination of Service in the Discretion of the Company and Voluntary Termination*

An employee who acquires a vested right to his accrued pension prior to having attained age sixty-five (65) and *who terminates voluntarily or whose service is terminated* by the Company for a reason other than disability will be eligible for a pension if his age plus years of accredited service shall total not less than seventy-five (75), or a deferred pension (or a cash-out of his deferred pension) if his age plus years of accredited service shall total less than seventy-five (75).

F. *Cash–Out of Deferred Pension*

*An employee* whose age plus years of accredited service equal less than seventy-five (75) and *who, on termination of service* with the Company has vested rights, may, in lieu of a deferred pension, *cash-out the value* of his pension payable at normal mandatory retirement age sixty-five (65).

The employee will be allowed a reasonable period *after termination* in which to advise the administrator whether he chooses either to cash-out or take a deferred pension. However, this period will not extend beyond the first day of the second month following the employ-ee's date of *termination.* (emphasis added).

Under the applicable legal requirements, in the absence of any severance of employment or termination of the Plan, such a pension plan could not permit participants to withdraw all or part of the funds accumulated on their behalf and consisting of employer contributions or the earnings thereon (*i.e.,* to cash-out). If a plan permits pre-termination withdrawal of funds, then the plan would not "qualify" as an employee benefit plan for income tax purposes under the Internal Revenue Code and without qualification the employer's contributions would not be tax deductible, earnings would be taxed, and the employees would have to declare the contributions as income. Int.Rev.Code of 1954, §§ 401(a), 501(a).

In 1956, the Internal Revenue Service issued a ruling providing that:

Section 1.401–1 of the Income Tax Regulations defines a pension plan as a plan established and maintained by an employer primarily to provide systematically for the payment of definitely determined benefits to his employees over a period of years, usually for life, after retirement. The word "primarily" in the definition of a pension plan was intended to mean that such a plan is not precluded from meeting the applicable requirements for qualification merely because it provides benefits prior to normal retirement, such as for disability or death benefits, which are only incidental to the main purpose of the plan. *However, a pension plan which permits the participants, prior to any severance of employment (e.g., retirements, disability, or death) to withdraw all or a part of the funds accumulated on their behalf is inconsistent with the accepted concept of a pension plan which meets all of the requirements of Section 401(a) of the Code.*

Accordingly, *it is held that, although an employees' qualified pension plan may provide benefits prior to normal retirement,* such as disability and death benefits, which are only incidental to the main

purpose of the plan, *an employees' pension plan which permits the participants, prior to any severance of their employment or the termination of the plan, to withdraw all or a part of the funds accumulated on their behalf in times of a financial need or otherwise, will fail to meet the requirements of Section 401(a) of the Code.*

Rev.Rul. 56–693, 1956–2 C.B. 282 (emphasis added), *modified* Rev.Rul. 60–323, 1960–2 C.B. 148.

■ According to Helmer, when he resigned from Con Ed to get a cash-out in 1979, he did not resign "to [his] knowledge." However, whether Helmer remained an employee after he cashed out his pension in 1979 cannot depend on his subjective view of the matter, in view of the documentary evidence.

The termination of employment status of an individual on a leave of absence is an action peculiarly within Con Ed's knowledge and power to effect, particularly because the termination of Helmer's employment was required by both the law and the pension plan whose benefits he accepted.

■ In addition, substantial deference is accorded to the letter from the office of the NLRB's General Counsel denying Helmer's appeal from the dismissal of Helmer's charges against Con Ed and the Local. Where, as here, the NLRB has to determine whether an individual remains on a leave of absence (and is therefore an employee) or has had his or her employment terminated, the NLRB generally gives conclusive weight to objective evidence such as employer records showing termination. *See e.g., Harry Lunstead Designs, Inc.,* 270 N.L.R.B. 1163, 1164 (1984). It specifically found that the evidence indicated that Helmer "cashed out his pension plan in 1979 terminating his employment with the Employer."

■ While the NLRB General Counsel's decision not to issue a complaint may not have *res judicata* effect, such findings should be given "considerable weight" by the court in ruling on a summary judgment motion. *Berard v. General Motors Corp.,*

493 F.Supp. 1035, 1040 (D.Mass.1980), *aff'd,* 657 F.2d 261 (1st Cir.1980), *cert. denied,* 451 U.S. 987, 101 S.Ct. 2322, 68 L.Ed.2d 845 (1981). Once the NLRB's findings are offered by the respondent in a summary judgment motion, the plaintiff is " 'then obligated to demonstrate by affidavit that a genuine of fact exist[s] in spite of the [NLRB] finding.' " *Id.* (quoting *Smith v. Local 25, Sheet Metal Workers International Association,* 500 F.2d 741, 748 n. 4 (5th Cir.1974)). Here since Helmer can offer no specific evidence to rebut the NLRB finding that he terminated his employment in 1979, that issue may be resolved in Con Ed's favor. *See Boudreaux v. Vulcan Materials Co.,* 485 F.Supp. 347, 351 (E.D.Wis. 1980) (the NLRB finding "tends to underscore the onus that [the plaintiff] has of showing the existence of a genuine dispute of material fact.").

Whether by operation of the terms of the Plan or by his own acts, consciously undertaken, Helmer terminated his employment by cashing-out.

*Termination Extinguished Helmer's Leave of Absence*

Paragraph 32 of the Contract grants Con Ed employees leaves of absence from their jobs when they are elected or appointed to office in the Local, and they are certified by the Local as "having to be absent from their regular work." Only union officers who are on such leaves of absence under Paragraph 32 may claim reinstatement to their former jobs. Until the events of 1988 underlying this action, no question had been raised as to Helmer's leave of absence status, either by the Local or Con Ed. The question has already been noted in this case as to whether union officers could continue on a leave of absence under Paragraph 32 even after termination of their employment with Con Ed. *Helmer v. Briody,* 721 F.Supp. 498, 504 (S.D.N.Y.1989). The NLRB has stated that "a leave of absence[,] in the ordinary sense of the word[,] implies a continuing employer-employee relationship." *Hercules Inc.,* 225 N.L.R.B. 241, 242 (1976).

Furthermore, Con Ed as a matter of practice ends a leave of absence when em-

ployment is terminated under circumstances other than those at issue here. Only those who have not terminated their employment are deemed by Con Ed to be inactive employees on leaves of absence, and, therefore, to have possible reinstatement rights. This is consistent with the language of Paragraph 32, which specifically states that it applies only to individuals "having to be absent from their regular work." Those whose employment has been terminated have severed their ties with Con Ed and are considered ineligible for reinstatement under Paragraph 32.

■ Helmer has not adduced any evidence to raise an issue of fact as to how Paragraph 32 should be interpreted. Under the applicable principles, an individual's employment status is normally determined by objective evidence, consisting of the employer's records, practices and procedures. *See, e.g., NLRB v. Economics Laboratory,* 857 F.2d 931 (3d Cir.1988). Moreover, Con Ed's records clearly indicate that his employment was terminated in accordance with the applicable practices and procedures. Under the relevant principles, therefore, his employment was terminated, regardless of his alleged lack of knowledge or intent. *See Economics Laboratory, supra,* 857 F.2d at 938 n. 15; *Harry Lunstead Designs, Inc., supra,* 270 N.L.R.B. at 1164; *Hercules, Inc., supra,* 225 N.L.R.B. at 242.

The failure of the Local and Con Ed to define "leave of absence" in the Contract as initially written, or after the enactment of the Plan, regrettably, does not relieve the court of the necessity under these circumstances to determine the effect of termination on the term. Helmer urges that Con Ed has failed to justify its position that the requirements of the Plan should take precedence over the terms of Paragraph 32. Of course, the tax status of a pension plan is also important. *Meckes v. Cina,* 75 A.D.2d 470, 429 N.Y.S.2d 936 (4th Dep't 1980), *aff'd,* 54 N.Y.2d 894, 444 N.Y.S.2d 918, 429 N.E.2d 425 (1981). Where, as here, a conflict exists between the Contract and the Plan, the Plan requirements prevail.

The duration of the leave of absence benefit granted to employees to hold union office is granted to no other employee. To extend that benefit to non-employees would be a further expansion of the benefit. The teaching of the NLRA and the LMRA provisions is that benefits based upon union activities or employee representative status are to be conferred with extreme caution. *See generally BASF Wyandotte Corp. v. Local 227, International Chemical Workers Union,* 791 F.2d 1046 (2d Cir.1986).

Regrettably for Helmer, the possibility of being "reemployed" on the form pursuant to which he obtained his pension cash-out does not give rise to reinstatement. Reemployment and reinstatement are distinctly different concepts. Reemployment, as set forth in the controlling documents, depends upon job availability and is something which can happen only to former employees. Both the language of the Contract, as set forth in Paragraphs 32 and 45(2), and the practice of Con Ed reflect this distinction. Accordingly, the reference to reemployment on the cash-out form supports, rather than undermines, the Con Ed position. The possibility that employees who have cashed-out their pension benefits may be reemployed and may re-vest in the Plan in the future does create a continuing "linkage" between such individuals and Con Ed, but falls short by definition of creating reinstatement rights.

Helmer has advanced the proposition that the courts frown upon constructions of contractual language which result in forfeitures. The only case cited by plaintiff, *Terones v. Pacific States Steel Corp.,* 526 F.Supp. 1350 (N.D.Cal.1981), concerned forfeiture of pension benefits. Nothing that Con Ed has done has resulted or will result in the forfeiture of any pension benefits by Helmer. The concept of forfeiture, as a reading of the sections of Williston's *Contracts* cited by Helmer makes abundantly clear, is not even remotely applicable. *See also,* 22 Carmody–Wait 2d § 135:39 (1968) ("[A] forfeiture is a divestiture of property without compensation which is imposed by way of punishment in consequence of a default or an offense....").

Despite the harsh effect on Helmer's employment prospects, the provisions of Paragraph 32 must be set aside upon termination of employment by the union official. The price for failing to heed the meaning of "terminating" and the language of the Plan far exceeds the more than $5,000 Helmer received in 1979. Were it otherwise, an open ended right to reinstatement would be created for union officers alone. Termination, however technical, has extinguished Helmer's leave of absence.

*Conclusion*

Based on the facts and conclusions set forth above, the motion for summary judgment by Con Ed is granted. Submit judgment on notice.

The remaining parties are directed to attend a pretrial conference at the convenience of the court and counsel.

It is so ordered.